

APR 18 2018
Clerk, U.S. District Court
Texas Eastern

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | No. 4:17CR118 |
| | § | Judge Crone |
| HOWARD GREGG DIAMOND (1) | § | |
| JORDAN BROOKE JOHNSON (2) | § | |

## SECOND SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### Count One

Violation: 21 U.S.C. § 846
(Conspiracy to Possess with the Intent to Distribute and Dispense and Distributing and Dispensing of Controlled Substances)

From in or about January 2010 and continuing up to and including the date of this Second Superseding Indictment, in the Eastern District of Texas and elsewhere, the defendants, **Howard Gregg Diamond, Jordan Brooke Johnson** and others both known and unknown to the grand jury, did knowingly and intentionally combine, conspire, and agree with each other and another person or persons known and unknown to the grand jury to possess with intent to distribute and dispense and distribute and dispense controlled substances, in violation of 21 U.S.C. § 841, as described below:

**Howard Gregg Diamond, Jordan Brooke Johnson** and others known and unknown to the grand jury, while acting and intending to act outside the usual course of

Second Superseding Indictment - Page 1

professional practice and without a legitimate medical purpose, wrote and filled prescriptions for the following Schedule II controlled substances:

substances containing a detectable amount of fentanyl;
substances containing a detectable amount of morphine;
substances containing a detectable amount of oxycodone;
substances containing a detectable amount of oxymorphone;
substances containing a detectable amount of methadone;
substances containing a detectable amount of hydrocodone;
substances containing a detectable amount of hydromorphone;

and, for the following Schedule IV controlled substances:

substances containing a detectable amount of alprazolam;
substances containing a detectable amount of zolpidem;
substances containing a detectable amount of carisoprodol; and
substances containing a detectable amount of diazepam.

**General Information**

1. **Howard Gregg Diamond** was a physician practicing in the Grayson and Lamar Counties of Texas with clinics located in Sherman and Paris, Texas.

2. **Jordan Brooke Johnson** was an employee of **Howard Gregg Diamond** who primarily worked at the office in Sherman, Grayson County, Texas.

**The Controlled Substances Act ("CSA")**

3. Controlled substances under the CSA, including drugs and pharmaceuticals, are divided into five "Schedules" designated by Roman numerals I through V. Substances are categorized by schedule based on whether the substances have a current accepted medical use in treatment in the United States, the substances' relative abuse potential, and the substances' likelihood of causing dependence when abused.

4. Schedule I controlled substances have no currently accepted medical use in the United States, a lack of accepted safety for use under medical supervision, and a high potential for abuse. *See* 21 U.S.C. § 812(b)(1). Examples of Schedule I drugs include heroin, LSD, and "Ecstasy."

5. Schedule II controlled substances have a currently accepted medical use in the United States, or a currently accepted medical use with severe restrictions; yet, these

substances also have a high potential for abuse, which may lead to severe psychological or physical dependence. *See* 21 U.S.C. § 812(b)(2). Examples of Schedule II drugs include hydromorphone (Dilaudid®), methadone (Dolophine®), oxycodone (OxyContin®), and fentanyl (Sublimaze®, Duragesic®).

6. Schedule III controlled substances have a currently accepted medical use in the United States and a potential for abuse less than Schedule I and II substances, which may lead to moderate or low physical dependence or high psychological dependence. *See* 21 U.S.C. § 812(b)(3). Examples of Schedule III drugs include products containing not more than 90 milligrams of codeine per dose unit (Tylenol with Codeine®), buprenorphine (Suboxone®), and ketamine.

7. Schedule IV controlled substances have a currently accepted medical use in the United States and a low potential for abuse relative to Schedule III substances, which may lead to limited physical dependence or psychological dependence relative to Schedule III substances. *See* 21 U.S.C. § 812(b)(4). Examples of Schedule IV drugs include alprazolam (Xanax®), diazepam (Valium®), and carisoprodol (Soma®).

8. Schedule V controlled substances have a currently accepted medical use in the United States and a low potential for abuse relative to Schedule IV substances, which may lead to limited physical dependence or psychological dependence relative to Schedule IV substances. *See* 21 U.S.C. § 812(b)(5). Examples of Schedule V drugs include cough preparations containing not more than 200 milligrams of codeine per 100 milliliters or per 100 grams (Robitussin AC®, Phenergan with Codeine®), and ezogabine.

9. To combat the diversion of controlled substances, the CSA requires registration and tracking requirements for the sale, dispensing, and distribution of these drugs. The CSA mandates strict adherence to a number of requirements by any person or business that handles, prescribes, dispenses, or distributes controlled substances.

10. A "cocktail" is a combination of commonly abused drugs, often drugs that interact to produce a certain type of euphoric effect or "high" in the person using the drugs in combination.

### Deaths Resulting from the Conspiracy to Possess with Intent to Distribute and Dispense and Distributing and Dispensing of Controlled Substances

The following deaths resulted from the conspiracy to possess with the intent to distribute and dispense and distributing and dispensing of the above controlled substances while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose:

11. On or about September 19 and 20, 2012, T.S. received prescriptions from **Howard Gregg Diamond** for fentanyl, hydromorphone, and alprazolam. On or about September 19, 2012, T.S. filled the controlled substance prescriptions she received from **Howard Gregg Diamond** at a pharmacy. On October 20, 2012, the fentanyl and alprazolam prescribed by **Howard Gregg Diamond** resulted in the overdose death of T.S. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

12. On or about May 24, 2013, N.K. received a prescription from **Howard Gregg Diamond** for methadone. On May 24, 2013, N.K. filled the controlled substance prescriptions he received from **Howard Gregg Diamond** at a pharmacy. On May 26, 2013, the methadone prescribed by **Howard Gregg Diamond** resulted in the overdose death of N.K. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

13. On or about October 29, 2013 and November 27, 2013, A.C. received prescriptions from **Howard Gregg Diamond** for hydrocodone and morphine. On November 26 and 27, 2013, A.C. filled the controlled substance prescriptions she received from **Howard Gregg Diamond** at pharmacies. On December 3, 2013, the hydrocodone and morphine prescribed by **Howard Gregg Diamond** resulted in the overdose death of A.C. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

14. On or about July 15, 2014, T.H. received a prescription from **Howard Gregg Diamond** for morphine, oxycodone, alprazolam, and zolpidem. On July 15, 2014, T.H. filled the controlled substance prescriptions she received from **Howard Gregg Diamond** at a pharmacy in Sherman, Texas. On July 25, 2014, the morphine prescribed by **Howard Gregg Diamond** resulted in the overdose death of T.H. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

15. On or about October 8, 2015, R.S. received a prescription from **Howard Gregg Diamond** for methadone, alprazolam, and oxycodone. On October 10, 2015, R.S. filled the controlled substance prescriptions he received from **Howard Gregg Diamond** at a pharmacy. On October 16, 2015, the methadone and oxycodone prescribed by **Howard Gregg Diamond** resulted in the overdose death of R.S. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

16. On or about February 4, 2016, T.B. received a prescription from **Howard Gregg Diamond** for oxycodone. On February 4, 2016, T.B. filled the controlled substance prescription she received from **Howard Gregg Diamond** at a pharmacy. On February 15, 2016, the oxycodone prescribed by **Howard Gregg Diamond** resulted in the overdose death of T.B. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

17. On or about January 21, 2016, H.G. received a prescription from **Howard Gregg Diamond** for oxymorphone and oxycodone. On January 22, 2016, H.G. filled the prescriptions she received from **Howard Gregg Diamond** at a pharmacy. On February 14, 2016, the oxymorphone prescribed by **Howard Gregg Diamond** resulted in the overdose death of H.G. in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

All in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2.

### Counts Two- Eight

> Violation: 21 U.S.C. § 841(Possession with the Intent to Distribute and Dispense and Distributing and Dispensing of Controlled Substances); 18 U.S.C. § 2 (Aiding and Abetting)

From in or about January 2010 and continuing up to and including the date of this Second Superseding Indictment, in the Eastern District of Texas and elsewhere, the defendants **Howard Gregg Diamond** and **Jordan Brooke Johnson** did knowingly and intentionally possess with intent to distribute and dispense and distribute and dispense controlled substances, in violation of 21 U.S.C. § 841 as described below:

**Howard Gregg Diamond** and **Jordan Brooke Johnson** while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, wrote, filled and dispensed prescriptions for the following Schedule II controlled substances:

substances containing a detectable amount of fentanyl;
substances containing a detectable amount of morphine;
substances containing a detectable amount of oxycodone;
substances containing a detectable amount of oxymorphone;
substances containing a detectable amount of methadone;

substances containing a detectable amount of hydrocodone[1];
substances containing a detectable amount of hydromorphone;

and, for the following Schedule IV controlled substances:

substances containing a detectable amount of alprazolam;
substances containing a detectable amount of zolpidem;
substances containing a detectable amount of carisoprodol; and
substances containing a detectable amount of diazepam.

The below listed deaths resulted from the possession with the intent to distribute and dispense and distribution and distributing of the below listed controlled substances in violation of 21 U.S.C. § 841:

| Count | On or About Date Prescription Received | Prescription | Patient | On or About Date Prescription Filled | On or About Date of Overdose Death | Drugs Causing Overdose |
|---|---|---|---|---|---|---|
| Two | September 19 and 20, 2012 | fentanyl, hydromorphone, and alprazolam | T.S. | September 19 and 20, 2012 | October 20, 2012 | alprazolam and fentanyl |
| Three | May 24, 2013 | methadone | N.K. | May 24, 2013 | May 26, 2013 | methadone |
| Four | October 29, 2013 | hydrocodone and morphine | A.C. | November 26 and 27, 2013 | December 3, 2013 | Hydrocodone and morphine |
| Five | July 15, 2014 | morphine, oxycodone, alprazolam, and zolpidem | T.H. | July 15, 2014 | July 25, 2014 | morphine |
| Six | October 8, 2015 | methadone, alprazolam, and oxycodone | R.S. | October 10, 2015 | October 16, 2015 | methadone and oxycodone |
| Seven | February 4, 2016 | oxycodone | T.B. | February 4, 2016 | February 15, 2016 | oxycodone |

---

[1] Prior to October 6, 2014, the CSA and its implementing regulations classified hydrocodone as a Schedule III controlled substance. Beginning on October 6, 2014, hydrocone was re-classified as a Schedule II controlled substance.

Second Superseding Indictment - Page 6

| **Eight** | January 21, 2016 | oxymorphone and oxycodone | H.G. | January 22, 2016 | February 14, 2016 | oxymorphone |

## Counts Nine - Eighteen

Violation: 18 U.S.C. §§ 1347 and 2<br>(Health Care Fraud and Aiding and Abetting)

## General Allegations

At all times relevant to this Second Superseding Indictment:

The grand jury incorporates by reference all proceeding paragraphs as if fully stated herein.

## The Medicare Program

1. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of sixty-five and some persons under the age of sixty-five who are blind or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency. Individuals who receive benefits under Medicare are referred to as "beneficiaries."

2. Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b). It is a public plan affecting commerce in which medical services are provided to individuals and individuals who provide medical services may obtain payments.

3. Medicare is a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f). It is a program that provides health benefits, and is funded directly by the United States Government.

4. There was a voluntary Supplemental Insurance Benefit under Medicare that was known as Part B. Part B pays for the outpatient expenses of physicians, therapists, laboratories, x-rays, and durable medical equipment for use in the home.

5. The Omnibus Budget Reconciliation Act of 1989 requires all providers and suppliers of Medicare Part B services to submit, within one year from the date of service, claims to Medicare carriers on behalf of Medicare beneficiaries. During this period, providers can file their Medicare Part B claims either electronically or in paper form.

Medicare reimbursement to the provider is made by either an electronic funds transfer or by check payable to the provider and delivered by U.S. mail.

6. In order to obtain reimbursement from Medicare for medical services provided to beneficiaries, providers have to submit claims on form CMS-1500 (formerly known as HCFA-1500 Forms). Providers are paid for their medical services based upon information contained in the CMS-1500 claim forms.

7. The provider must state the following information on the CMS-1500 form: the provider's signed certification that the services and procedures for which the reimbursement is requested were (1) medically necessary for the health of the patient; (2) actually provided by the medical provider making the claim; and (3) adequately documented in the patient's medical treatment records (the provider certification). A provider may authorize and direct office personnel to use a signature stamp to signify this certification on claims prepared and submitted under the provider's direction.

8. Physician providers may utilize the services of a nurse practitioner (NP) in treating their patients. For the services to be compensable under Medicare Part B, the following criteria must be met:

   a. They are the type that are considered physician services if furnished by a doctor of medicine or osteopathy (MD/DO);
   b. They are performed by a person who meets the definition of an NP;
   c. The NP is legally authorized to perform the services in the state in which the services are rendered;
   d. They are performed in collaboration with the MD/DO; and
   e. They are not otherwise precluded from coverage because of one of the statutory exclusions.

9. Direct billing and payment for NP services may be made to the NP, or the services can be billed "incident to" the physician's services. Direct billed NP services are compensable at a rate that is approximately 15% less than the rate paid to physicians for the same services.

10. In order to have NP services covered as "incident to" the services of a physician, it must be performed under the direct supervision of the physician as an integral part of the physician's personal in-office service.

11. Medicare providers sign an agreement with Medicare in which they state that they are familiar with Medicare's billing requirements and in which they promise not to submit false or fraudulent claims.

12. All payments made by Medicare are made to a provider in the form of a pre-arranged electronic deposit into the provider's bank account.

13. From in or around September 2015, and continuing through in or around April 2017, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere, the defendant, **Howard Gregg Diamond**, MD, aided and abetted by others both known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services.

## Purpose of the Scheme

14. It was the general purpose of the scheme and artifice for **Howard Gregg Diamond** to unlawfully obtain money from Medicare through misrepresentations and violations of Medicare rules. To this end, **Howard Gregg Diamond** would, among other things, (a) submit and cause the submission of false and fraudulent claims to Medicare, and (b) conceal the submission of false and fraudulent claims to Medicare.

## Acts in Execution of the Scheme and Artifice – Billing for Services Not Rendered

15. On or about the dates specified as to each count below, in the Eastern District of Texas, and elsewhere, Howard Gregg Diamond submitted and caused the submission of claims to Medicare for approximately the identified dollar amounts, and represented that, on or about the identified dates of service, the identified patients were treated by himself, when in fact, Howard Gregg Diamond was traveling to the indicated location for the specified time period, and such patients were treated by an NP, or not at all.

| Count | Medicare Beneficiary HICN | Alleged Date of Service | Trip Dates | Trip Information | Service Billed | Billed Amount |
|---|---|---|---|---|---|---|
| 9 | ***0846A | 9/29/15 | 9/28/15-10/4/15 | Dal - Boston | Office Visit | $117.00 |
| 10 | ***9265A | 7/11/16 | 7/8/16-7/18/16 | DFW-San Diego | Office Visit | $244.00 |

Second Superseding Indictment - Page 9

| Count | Medicare Beneficiary HICN | Alleged Date of Service | Trip Dates | Trip Information | Service Billed | Billed Amount |
|---|---|---|---|---|---|---|
| 11 | ***6546A | 7/12/16 | 7/8/16-7/18/16 | DFW-San Diego | Office Visit | $363.00 |
| 12 | ***0080A | 7/15/16 | 7/8/16-7/18/16 | DFW-San Diego | Office Visit | $244.00 |
| 13 | ***7839A | 3/7/17 | 3/6/17-3/12/17 | DFW-Orlando | New patient office visit | $556.00 |
| 14 | ***4630A | 3/11/17 | 3/6/17-3/12/17 | DFW-Orlando | Office Visit | $420.00 |
| 15 | ***5846A | 3/9/17 | 3/6/17-3/12/17 | DFW-Orlando | Office Visit | $420.00 |
| 16 | ***5846A | 3/9/17 | 3/6/17-3/12/17 | DFW-Orlando | Aspiration or Injection | $500.00 |
| 17 | ***5846A | 3/9/17 | 3/6/17-3/12/17 | DFW-Orlando | Ultrasound | $275.00 |
| 18 | ***5846A | 3/9/17 | 3/6/17-3/12/17 | DFW-Orlando | Injection | $100.00 |

### Counts Nineteen-Twenty-One

<u>Violation:</u> 18 U.S.C. §§ 1957 and 2 (Money Laundering and Aiding and Abetting)

The grand jury incorporates by reference all proceeding paragraphs as if fully stated herein.

On or about the dates listed for each count below, within the Eastern District of Texas, **Howard Gregg Diamond** knowingly engaged in the following monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, involving funds that were the proceeds of criminally derived property and had a value in excess of $10,000, and were derived from a specified unlawful

Second Superseding Indictment - Page 10

activity, with each such transaction constituting a separate count in the Second Superseding Indictment:

| Count | Date | Transaction Amount | Specified Unlawful Activity |
|---|---|---|---|
| 19 | 09/02/14 | $15,000.00 | 21 U.S.C. § 841 |
| 20 | 07/30/15 | $12,000.00 | 21 U.S.C. § 841 |
| 21 | 01/11/16 | $13,010.00 | 21 U.S.C. § 841 |

All in violation of 18 U.S.C. §§ 1957 and 2.

## NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

Criminal Forfeiture Pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(7)

As a result of committing the offenses charged in this Second Superseding Indictment, the defendant shall forfeit to the United States any property he may have used or intended to use to commit or facilitate the offenses and/or property derived from proceeds obtained directly or indirectly as a result of the commission of the violation of 21 U.S.C. §§ 846, 841. The defendant shall also forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses pursuant to 18 U.S.C. § 982(a)(7).

## MEDICAL LICENSE

The government provides notice of its intention to seek forfeiture of the following specific item of property, including but not limited to: **Howard Gregg Diamond**'s medical license.

## DEA REGISTRATION NUMBERS

The government provides notice of its intention to seek forfeiture of the following specific item of property, including but not limited to: **Howard Gregg Diamond**'s DEA registration numbers.

## SUBSTITUTE ASSETS

Moreover, if, as a result of any act or omission of the defendant, any property subject to forfeiture:

(a) cannot be located upon the exercise of due diligence;
(b) has been transferred or sold to, or deposited with a third person;
(c) has been placed beyond the jurisdiction of the court;
(d) has been substantially diminished in value; or
(e) has been commingled with other property which cannot be subdivided without difficulty;

the United States intends to seek forfeiture of any other property of the defendant up to the value of the forfeitable property, including but not limited to all property, both real and personal owned by the defendant. As a result of the commission of the offenses alleged in this Second Superseding Indictment, any and all interest that the defendant has in any such property is vested in and forfeited to the United States.

All such proceeds and/or instrumentalities are subject to forfeiture by the government.

A TRUE BILL

_____
GRAND JURY FOREPERSON

JOSEPH D. BROWN
UNITED STATES ATTORNEY

_____
HEATHER HARRIS RATTAN
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | No. 4:17CR118<br>Judge Crone |
| HOWARD GREGG DIAMOND (1)<br>JORDAN BROOKE JOHNSON (2) | § § | |

## NOTICE OF PENALTY

### Count One

Violation: 21 U.S.C. § 846

Penalty: Not less than 10 years and not more that life imprisonment, a fine not to exceed $10 million, or both; supervised release of at least 5 years; If death or serious bodily injury resulted from the uses of such substances then a term of imprisonment of not less than twenty (20) years or more than life, a fine not to exceed $1,000,000, or both. A term of supervised release of at least five (5) years.

Special Assessment: $ 100.00

### Counts Two through Eight

Violation: 21 U.S.C. § 841

Penalty: Not less than 10 years and not more that life imprisonment, a fine not to exceed $10 million, or both; supervised release of at least 5 years; If death or serious bodily injury resulted from the uses of such substances then a term of imprisonment of not less than twenty (20) years or more than life, a fine not to exceed $1,000,000, or both. A term of supervised release of at least five (5) years.

Special Assessment: $ 100.00

Second Superseding Indictment - Page 14

## Counts Nine - Eighteen

Violation: 18 U.S.C. §§ 1347 and 2

Penalty: Not more than ten (10) years imprisonment; a fine not to exceed $250,000 (or not more than twice the gross gain), or both; supervised release of not more than three (3) years. If serious bodily injury resulted, then a term of imprisonment of not more than twenty (20) years, a fine not to exceed $250,000 (or not more than twice the gross gain), or both; supervised release of not more than five (5) years. If death resulted, then a term of imprisonment or any term of years or life, a fine not to exceed $250,000 (or not more than twice the gross gain), or both; supervised release of not more than five (5) years.

Special Assessment: $ 100.00

## Counts Nineteen-Twenty-One

Violation: 18 U.S.C. §§ 1957 and 2

Penalty: Not more 10 years imprisonment; a fine not to exceed $250,000, (or not more than twice the amount of the criminally derived property involved in the transaction), or both; supervised release of not more than three (3) years.

Special Assessment: $ 100.00